UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                               )
CITY OF NEW BEDFORD, HOUSING    )
70 CORPORATION, CITY OF NEW     )
BEDFORD HARBOR DEVELOPMENT       )
COMMISSION, and CITY OF NEW     )
BEDFORD REDEVELOPMENT           )
AUTHORITY,                      )        CIVIL ACTION
                               )        NO. 15-10242-WGY
              Plaintiffs,       )
                               )
        v.                      )
                               )
AVX CORPORATION,                )
                               )
              Defendant.        )
_____)

MEMORANDUM & ORDER

YOUNG, D.J.                                    August 27, 2015

## I.    INTRODUCTION

     The Plaintiffs, City of New Bedford, Housing 70

Corporation, New Bedford Harbor Development Commission, and New

Bedford Redevelopment Authority (collectively, the

"Plaintiffs"), brought this suit in the Massachusetts Superior

Court sitting in and for the County of Bristol against AVX

Corporation ("AVX") seeking to recover response costs incurred

in the course of cleaning up the Plaintiffs' property and to

recoup any tort and property damages.  AVX filed a motion to

remove the case to federal court and now moves to dismiss the

case for failure to state a claim.  AVX argues that the

Plaintiffs' response cost claims are moot because the contribution protection clause in an earlier Consent Decree clearly protects AVX from any lawsuit arising from the Plaintiffs' property here at issue.

### A.   Procedural History

The Plaintiffs initially filed suit in the Superior Court in October 2014.  Notice Removal, Ex. A, Compl., ECF No. 1-1. On February 2, 2015, AVX removed the case to this Court pursuant to 28 U.S.C. § 1441.  Notice Removal, ECF No. 1.  A week later, AVX filed a motion to dismiss for failure to state a claim and an accompanying memorandum in support of that motion.  Def. AVX Corp.'s Mot. Dismiss, ECF No. 6; Mem. Law Supp. Def. AVX Corp.'s Mot. Dismiss ("Def.'s Mem."), ECF No. 7.  The Plaintiffs filed their opposition to the motion on March 6, 2015.  Pls.' Opp'n Def. AVX Corp.'s Mot. Dismiss, ECF No. 19; Mem. Law Supp. Pls.' Opp'n Def. AVX Corp.'s Mot. Dismiss ("Pls.' Opp'n"), ECF No. 20. On March 27, 2015, the Defendant filed a reply memorandum regarding the motion to dismiss.  Reply Mem. Law Further Supp. Def. AVX Corp.'s Mot. Dismiss ("Def.'s Reply"), ECF No. 26.  On April 8, 2015, this Court heard oral argument and took this matter under advisement.  Elec. Clerk's Notes, April 8, 2015, ECF No. 29.

**B.   Factual Background**

The property at the heart of this case consists of approximately 21.56 acres owned by the Plaintiffs inside the larger North Terminal Rail Yard (the "Rail Yard"), which is bounded by Acushnet Avenue, Herman Melville Avenue, and Wamsutta Street in New Bedford.[1]  Compl. ¶ 10.  The Plaintiffs currently own the following parcels in the Rail Yard:

a) City of New Bedford: Lots 99, 127, 132, 133, 133A, 172, 244, 262, and 264
b) New Bedford Harbor Development Commission: Lot 101
c) New Bedford Redevelopment Authority: Lots 121 and 157
d) Housing 70 Corporation: Lots 275 and 287.

Id. ¶ 11.  The City of New Bedford purchased Lot 99 from CSX Transportation, Inc. on or about January 26, 2012. Pls.' Opp'n 6-7; Aff. Gregor I. McGregor Supp. Pls.' Opp'n Def. AVX Corp.'s Mot. Dismiss ("McGregor Aff."), Ex. D, Release Deed, ECF No. 21-4.

From 1947 to 1973, Aerovox Corporation, a corporate predecessor to AVX, operated a capacitor manufacturing facility in New Bedford and received shipments of polychlorinated biphenyls ("PCBs") at the Rail Yard.  See Compl. ¶¶ 13-15.  The

---

[1] The Rail Yard was often referred to as the Conrail Rail Yard and now is formally referred to as the North Terminal Rail Yard.  Def.'s Mem. 3.  The Rail Yard was an active rail yard owned and operated by the Penn Central Transportation Company. Notice Removal, Ex. A, Demand Letter 1 n.3, ECF No. 1-1.

Plaintiffs allege that Aerovox employees spilled PCBs at the Rail Yard in the course of transferring PCBs from tank cars to fifty-five-gallon drums and tank trucks.  Id. ¶ 21.  In March 1985, Environmental Protection Agency ("EPA") Region I conducted an investigation on the Rail Yard in response to allegations that PCB spills contaminated the property.  Id. ¶ 27.  The EPA found PCBs in the Rail Yard, and a later 1997 investigation conducted by an EPA contractor showed that the soils from the central portion of the property were highly contaminated from PCBs and other pollutants.  Compl. ¶¶ 28-29.

The United States and the Commonwealth of Massachusetts sued AVX regarding the PCB spills in the New Bedford Harbor and Acushnet River estuary in 1983.  See Docket No. 83-03882-WGY. In 1991, AVX entered into an agreement with the United States and the Commonwealth of Massachusetts settling the lawsuit against it by agreeing, inter alia, to pay them $66,000,000. Compl. ¶ 25; Decl. Counsel, Ex. A, Consent Decree Def. AVX Corp. ("Consent Decree") ¶ 7, ECF No. 11-1.  The Consent Decree included a contribution protection clause protecting AVX from future contribution lawsuits from others who might seek to recover damages and costs regarding the contamination of the Rail Yard and the surrounding New Bedford Harbor Site.  See id. ¶ 27.  The contribution protection clause reads:

4

> Upon court approval of this settlement, AVX shall have
> the benefits of Section 113(f) of CERCLA, 42 U.S.C. §
> 9613(f), Section 4 of Mass. Gen. Laws c. 231B, and any
> other applicable law limiting its liability to persons
> not a party to this Consent Decree or affording it
> rights of contribution or other rights to recover
> costs or damages relating to the New Bedford Harbor
> Site from such persons.

Id.  The "New Bedford Harbor Site" is defined in the Consent

Decree as:

> [T]he New Bedford Harbor Superfund Site, located in
> portions of New Bedford, Acushnet and Fairhaven,
> Massachusetts, including New Bedford Harbor, the
> Acushnet River Estuary extending north to the Wood
> Street Bridge, and any adjacent marine waters and
> sediments and shoreline areas which are the subject of
> EPA's current Remedial Investigation and Feasibility
> Study, including at least Areas 1, 2, and 3 as defined
> in 105 CMR 260.005.  The Site does not include any
> portion of the Aerovox Facility . . . .

Id. at ¶ 5.I.

In May 1997, the EPA notified the City of New Bedford and

Housing 70 that they might be liable for paying clean-up costs

for the contaminated portion of their properties in the Rail

Yard.  Compl. ¶ 30.  A Phase I Initial Site Investigation Report

for the Rail Yard filed in February 2000 confirmed that "the

most likely sources of PCBs at the Site are releases of PCB-

fluids during off-loading from railroad tank cars."  Decl.

Counsel, Ex. A, Phase I Initial Site Investigation Report

("Phase I Report") 6, ECF No. 8-1; Def.'s Mem. 6.  The report

listed the Plaintiffs and AVX as potentially responsible

parties.  Phase I Report 7-8.[2]  The Plaintiffs performed an assessment of the contaminated property and determined the course of an appropriate response.  Compl. ¶ 32.

In January 2002, the Plaintiffs applied to the Massachusetts Department of Environmental Protection ("MassDEP") for a "Special Project Designation" of the property in order to get MassDEP's approval of the Plaintiffs' remedial action on the property.  Id. ¶ 34.  MassDEP approved the Plaintiffs' plan in 2004, and actual remedial action began that same year.  Id. ¶ 35.  The Plaintiffs allege that they have spent more than $14,000,000 on remedial action and response costs and demand more than $10,000,000 from AVX.  Id. ¶ 37.

On February 28, 2012, the Plaintiffs, pursuant to Massachusetts General Laws, chapter 21E, sent AVX a demand letter seeking reimbursement for money spent on remedial action. Id. ¶ 45.  AVX responded to the letter in April 2012.  Id. ¶ 46. The Plaintiffs and AVX had a meeting to resolve this matter in August 2012 but did not reach a resolution.  See id. ¶ 47.

---

[2] AVX argues that the Phase I Report did not list AVX as a potentially responsible party.  Def.'s Mem. 6.  This is directly contradicted by the report itself, as it states that "Aerovox Corporation, and [its] successors, carried out operations at the site during which PCB-containing liquids were spilled at the site.  These entities are also potentially responsible parties." Phase I Report 8.

Later in the year, on October 10, 2012, AVX entered into a supplemental consent decree with the United States and the Commonwealth of Massachusetts and agreed to pay an additional $366,250,000 to the two governments.  Compl. ¶ 26; Decl. Counsel, Ex. K, Resps. Pub. Comments Proposed Supplemental Consent Decree Def. AVX Corp. 5, 17, ECF No. 8-11.  The Department of Justice solicited public comments on this Supplemental Consent Decree for sixty days from October 17, 2012 to December 17, 2012.  Id. at 5.  This Court approved the Supplemental Consent Decree on September 19, 2013.  Decl. Counsel, Ex. J, Supp. Consent Decree Def. AVX Corp. 21, ECF No. 8-10.  The Supplemental Consent Decree changed neither the definition of the New Bedford Harbor Site nor the scope of contribution protection.  Id. ¶ 6.B.

## II.  ANALYSIS

The Plaintiffs seek recovery on two grounds.  They seek (1) reimbursement of response costs they incurred on remedial action under Massachusetts General Laws, chapter 21E, sections 4 and 4A and (2) recovery of tort and property damages under Massachusetts General Laws, chapter 21E, section 5.  See Pls.' Opp'n 15, 18.  AVX moves to dismiss the complaint on the ground that the contribution protection clause in the Consent Decree moots the Plaintiffs' action.  Def.'s Mem. 9.  AVX argues that, on its face, the Consent Decree includes the Rail Yard; thus, it

7

is shielded from this lawsuit.  Id. at 10-11.  During the
hearing held on April 8, 2015, AVX admitted that the applicable
statute of limitation does not bar the Plaintiffs' response cost
reimbursement claim under section 4, but it contended that the
Plaintiffs' claim under section 5 is time-barred.  Tr. Mot.
Dismiss Hr'g 4:12-19, ECF No. 30.[3]

A.   **Standard of Review**

To overcome a motion to dismiss for failure to state a
claim under Rule 12(b)(6) of the Federal Rules of Civil
Procedure, a complaint must allege "enough facts to state a
claim to relief that is plausible on its face."  Bell Atl. Corp.
v. Twombly, 550 U.S. 544, 570 (2007).  The factual allegations
must be enough to raise a right to relief above the speculative
level.  Id. at 555.  The Court must accept all well-pleaded
factual allegations as true and draw all reasonable inferences
in favor of the non-moving party.  Langadinos v. Am. Airlines,
Inc., 199 F.3d 68, 69 (1st Cir. 2000).  The Court may disregard

---

[3] The relevant part of the hearing reads as follows:

MS. RYAN:  The statute of limitations argument does
not defeat response cost claims under Section 4.  It
defeats all other claims in the case.  Unless Ms.
Guizzetti can correct me.  But I think that's what it
is.

THE COURT:  So the response cost claims, at least as
far as the statute goes, they are allowed?

MS. RYAN:  If you -- yes, your Honor.

allegations that are legally conclusory or that merely repeat legal elements without offering specific factual support. Lemelson v. U.S. Bank Nat'l Ass'n, 721 F.3d 18, 21 (1st Cir. 2013).

On a motion to dismiss, the court ordinarily may only consider facts alleged in the complaints and exhibits attached thereto. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). In addition to the complaint, a court may also consider "documents the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiffs' claim; [and] . . . documents sufficiently referred to in the complaint." Id. Those documents in effect "merg[e] into the pleadings and the trial court can review [them] in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998). A document that has merged into a complaint in this fashion "trumps the allegation[s]" as they appear in the complaint itself. Lowenstern v. Residential Credit Sol., No. 11-cv-11760-MLW, 2013 WL 697108, at *3 (D. Mass. Feb. 25, 2013) (Wolf, J.) (citing Clorox Co. P.R. v. Proctor & Gamble Consumer Co., 228 F.3d 24, 32 (1st Cir. 2000)).

**B.    Merits of the Motion**

    **1.    The contribution protection clause in the Consent Decree is not clear on its face.**

AVX does not dispute the Plaintiffs' allegation that AVX is responsible for the contamination of the Rail Yard.  The dispute at issue is whether the contribution protection clause in the Consent Decree releases AVX's liability arising from that contamination.  AVX claims that the contribution protection clause in the Consent Decree unambiguously includes the Rail Yard and thus bars the Plaintiffs' lawsuit.  Def.'s Reply 3. The Plaintiffs allege that the Consent Decree did not cover the Rail Yard, so AVX is still liable for reimbursement of the response costs they have spent on the property.  Pls.' Opp'n 11.

The Plaintiffs support their argument by citing to a consent decree entered in 2003 in the case of United States v. Am. Premier Underwriters, et al., No. 03-CV-11403-NG.  The City of New Bedford and Housing 70 Corporation were defendants in that case.  Pls.' Opp'n 11.  In this 2003 consent decree, the EPA noted that it "considers the Railroad Depot Superfund Site as not part of the New Bedford Harbor Superfund Site."  McGregor Aff., Ex. A, Consent Decree in the case of United States v. Am. Premier Underwriters, et al. ("2003 Consent Decree") 2, 6, ECF No. 21-1.  Moreover, the Plaintiffs argue that the contribution protection clause did not release AVX's liability regarding the

Rail Yard because the Rail Yard does not appear in the
definition of the New Bedford Harbor Site.  Pls.' Opp'n 12.

   The core issue here is how the Court ought interpret the
scope of the contribution protection clause in the Consent
Decree.  To aid its interpretation, the Court looks to the rule
handed down in United States v. Charter Int'l Oil Co., 83 F.3d
510 (1st Cir. 1996).  In Charter Oil, the First Circuit directed
courts to look only at the "four corners" of the consent decree
itself when they interpret the scope and meaning of a consent
decree.  Id. at 516-17.  The court should start with the text of
the consent decree and ought not consider extrinsic evidence
when it deems that text unambiguous, as such evidence may not be
used to "contradict the written terms of the agreement."  Id. at
519-20.  To facilitate its interpretation of the text of a
consent decree, the court can rely on certain aids such as "the
circumstances surrounding the formation of the consent order,
any technical meaning words used may have had to the parties,
and any other documents expressly incorporated in the decree."
Id. at 517 (quoting United States v. ITT Cont'l Baking Co., 420
U.S. 223, 238 (1975)) (internal quotation marks omitted).

   When the court interprets the text of the consent decree,
it may employ ordinary tools of contract interpretation.  See,
e.g., Charter Oil, 83 F.3d at 517.  It is appropriate to apply
Massachusetts law when interpreting the Consent Decree in this

case.  See John S. Boyd Co., Inc. v. Boston Gas Co., 992 F.2d 401, 406 (1st Cir. 1993) (adopting Massachusetts contract law to determine an issue of successor liability in the context of CERCLA "so long as it is not hostile to the federal interests animating CERCLA"); 21 Fed. Proc., L. Ed. § 50:909 (stating that consent decrees are interpreted in conformity with the contract law of the state with the most interest in the dispute).  Under Massachusetts law, courts ought interpret a contract to "give effect to its plain language and give terms their usual and ordinary meaning."  Southern Union Co. v. Dep't of Pub. Utils., 458 Mass. 812, 820 (2011) (internal quotation marks omitted).

Whether a provision of a contract is ambiguous or not is matter of law.  LPP Mortg., Ltd. v. Sugarman, 565 F.3d 28, 31 (1st Cir. 2009).  In assessing whether a contract is ambiguous, the court must "examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties."  Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008).  "Contract language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken."  Id. (internal quotation marks omitted).  If the contract language is ambiguous, the court may consider extrinsic evidence "in order to give a reasonable construction in light of the intentions of the parties at the

time of formation of the contract." PhoneDOCTORx, LLC v.

Healthbridge Mgmt., Inc., 58 F. Supp. 3d 152, 160 (D. Mass.

2014) (Saylor, J.) (internal quotation marks omitted).

When this Court reads the Consent Decree on its face, the

scope of the contribution protection clause does not make clear

whether it encompasses the Rail Yard.  AVX's reading of the

definition of "New Bedford Harbor Site" gives the words in the

definition more than their usual and ordinary meaning.  AVX

argues that the Rail Yard is unambiguously included in the

definition because the Rail Yard is a part of "shoreline areas

which are the subject of EPA's current Remedial Investigation

and Feasibility Study."[4]  Def.'s Reply 3-4.  Shoreline is defined

as "the line along which a large body of water meets the land."

The Oxford Dictionaries, Shoreline,

http://www.oxforddictionaries.com/us/definition/american_english

/shoreline (last visited August 19, 2015).  The Rail Yard does

not meet the water at all: it sits more than 1,000 feet inland

---

[4] The definition of the "New Bedford Harbor Site" reads:

". . . the New Bedford Harbor Superfund Site, located
in portions of New Bedford, Acushnet and Fairhaven,
Massachusetts, including New Bedford Harbor, the
Acushnet River Estuary extending north to the Wood
Street Bridge, and any adjacent marine waters and
sediments and shoreline areas which are the subject of
EPA's current Remedial Investigation and Feasibility
Study. . ."

Consent Decree ¶ 5.I.

from the Acushnet River, and more than ten buildings stand in between the Rail Yard and the Acushnet River.  See Pls.' Opp'n 13 (citing documents describing the position of the Rail Yard). Giving the plain and usual meaning to "shoreline area," the Rail Yard is not unambiguously covered by the New Bedford Harbor Site because it is not sufficiently adjacent to the water to be considered a shoreline area.  See Southern Union Co., 458 Mass. at 820 (holding that the court gives terms their usual and ordinary meaning).

More importantly, the New Bedford Harbor Site covers only shoreline areas that are the subject of EPA's Remedial Investigation and Feasibility Study ("RI/FS").  AVX's interpretation of the word "subject" is broader than what the word means on its face.  AVX consistently argues, in its reply brief and during the oral argument, that the Rail Yard is a "subject" of the RI/FS and should be included in the scope of the contribution protection clause.  Def.'s Reply 4.  It cites to the definition of "subject" from the online Oxford Dictionary that "'subject' [is defined] as 'a person or thing that is being discussed, described, or dealt with.'"  Id.  AVX claims that the Rail Yard is a subject of the RI/FS because it was "discussed, described, and dealt with" throughout the study, including the point where the study identified the Rail Yard as an additional source of PCB contamination.  Id.

14

Such a broad reading would lead to an absurd result. Were this Court to follow AVX's logic, what lobsters and flounders eat is and should be a subject of the RI/FS because the food chain of the two marine creatures was "discussed, described, or dealt with" in the study. See Supplemental Decl. Counsel Supp. Def. AVX Corp.'s Mot. Dismiss, Ex. A, Feasibility Study Remedial Alternatives Estuary & Lower Harbor/Bay Vol. II ("RI/FS Volume II") 14, ECF No. 27-1. The ordinary meaning of the phrase "subject of" implies something that transcends mere mentions. The crux of RI/FS focused on how to deal with contaminated sediments, surface water, and biota of the upper estuary and lower harbor. It is true that the Rail Yard was mentioned in a few places in the study, such as a possible source of PCB discharged into the harbor, Decl. Counsel, Ex. C, Feasibility Study Remedial Alternatives Estuary and Lower Harbor Bay Volume I 14, ECF No. 8-3, and as one of the candidate sites for treatment facilities, RI/FS Volume II 24, 39-40. The study, however, never mentioned any research on the effect of PCBs on the Rail Yard nor any remedial plan to remove PCBs from the Rail Yard. It is hard to imagine that the Rail Yard is a subject of the RI/FS when there is not a single page of the study discussing the level of PCB contamination of the Rail Yard's topsoil nor any plan to take any "remedial" action on the Rail Yard. The RI/FS is a very detailed report spanning hundreds of

pages; accordingly, it is very possible that an ordinary person would not consider the Rail Yard a "subject of" the study when the study mentions it fewer than five times with less than a page in the aggregate.

The definition of the "New Bedford Harbor Site" in the Consent Decree is not clear on its face.  Contrary to what AVX contends, this Court will not read the text broadly.  See Charter Oil, 83 F.3d at 517 (refusing to interpret matters addressed in the consent decree broadly).  Since this Court cannot rule with certainty that the Rail Yard was intended to be included in the scope of contribution protection clause, it will proceed to consider any extrinsic evidence which may assist this Court's interpretation.  See id. at 519 (holding that in routine contract interpretation extrinsic evidence may be considered where the contract is ambiguous).

> **2.    Extrinsic evidence shows that the contribution protection clause is susceptible to an interpretation that excludes the Rail Yard.**

Since the definition of the "New Bedford Harbor Site" in the Consent Decree is ambiguous, this Court may look at extrinsic evidence to clarify the intent of the parties. PhoneDOCTORx, 58 F. Supp. 3d at 160.  Extrinsic evidence presents the possibility that the parties to the Consent Decree could well not have contemplated the inclusion of the Rail Yard within the contribution protection clause.

Among the sources of extrinsic evidence that the Plaintiffs offer, the EPA's comment regarding the Rail Yard in the 2003 consent decree is notable.  In the 2003 consent decree, the EPA noted that "[it] considers the Railroad Depot Superfund Site as not part of the New Bedford Harbor Superfund Site."  2003 Consent Decree 2, 6.  In the case that spawned the 2003 consent decree, the United States – which was one of the parties in the 1991 Consent Decree – sued various potentially responsible parties, including some of the Plaintiffs in this case, for environmental contamination on the Rail Yard property.  See 2003 Consent Decree.  If the United States intended the Rail Yard to be part of the New Bedford Harbor Site, there was no reason to pursue a separate action against different parties and explicitly to state that the Rail Yard is not part of the New Bedford Harbor Superfund Site.

Moreover, the United States' intention regarding the Rail Yard in the 1991 Consent Decree becomes clearer in the EPA Superfund Record of Decision Amendment regarding the New Bedford Harbor Site Superfund.  McGregor Aff., Ex. C, EPA Superfund R. Decision Am., ECF No. 21-3.  A person named Mr. Sylvia asked the EPA whether the New Bedford Harbor Superfund intended to clean up the Rail Yard,[5] and the EPA in response wrote that "[t]he New

---

[5] The relevant text as follows:

Bedford railroad terminal is not part of the New Bedford Harbor Superfund Site." Id. at 64.  Thus, the EPA expressed its intention unambiguously on the record that the Rail Yard was not part of the New Bedford Harbor Site.

In light of extrinsic evidence surrounding the Consent Decree, this Court holds that the contribution protection clause has a reasonable interpretation which does not include the Rail Yard within the scope of protection; this Court thus rules, as matter of law, that the scope of the contribution protection clause in the Consent Decree is ambiguous and the matter must be resolved by factfinding at trial.  See LPP Mortgage, Ltd., 565 F.3d at 30; Thermo Elemental Inc., 451 Mass. at 644.

### 3.    The Plaintiffs' claim under section 5 is time-barred.

The parties agree that the statute of limitation does not limit the Plaintiffs' response cost claim.  The only remaining claim that is worthy of statute of limitation analysis is one regarding Lot 99.  AVX claims that the Plaintiffs' tort and property damage claim as to Lot 99 is time-barred.  Def.'s Reply

---

"[T]he New Bedford Harbor-Superfund Forum members recommend that the contaminated soils at the Sawyer St. site be dewatered and the remaining sediment be transported by rail to a permitted landfill as far from New Bedford as possible, and that the clean-up of the railroad terminal in New Bedford proceed in conjunction with this remedy."

7.   The statute of limitation for a claim under Massachusetts
General Laws, chapter 21E, section 5 is three years.   See Mass.
Gen. Laws ch. 21E, § 11A.   The Plaintiffs argue that the statute
of limitation has not run out on this parcel of land because
they filed the complaint within three years of their purchase
date, and because the statute of limitation is tolled due to a
continuing trespass.   Pls.' Opp'n 18.

A claim under section five accrues when the Plaintiffs
"discovered or reasonably should have discovered the damage and
the cause of the damage."   See Town of Sturbridge v. Mobil
Corp., 195 F. Supp. 2d 330, 333 (D. Mass. 2002) (Gorton, J.).
The Plaintiffs do not seriously dispute that they had knowledge
that Lot 99 was contaminated with PCBs at the time of their
purchase.   The record amply supports the conclusion that the
Plaintiffs knew or should have known of the contamination on the
property.   After all, they were conducting remedial action on
the Rail Yard well prior to their purchase and even bought the
piece of land "pursuant to a Settlement Agreement resolving
claims related to the North Terminal Rail Yard site."   Pls.'
Opp'n 6.

Making the Plaintiffs' purchase date the accrual date for
the statute of limitation would lead to an absurd result.   If
subsequent buyers could succeed to a cause of action with a
renewed statute of limitation, the statute of limitation would

be rendered useless.  See McCoy v. Gustafson, 103 Cal. Rptr. 3d 37, 75 (Cal. Ct. App. 2009) (holding that an owner must bring its claim of tortious injury to real property within the statutory period or the claim will be barred for it and all subsequent owners).  In this case, the claim accrued on the date when the owners of the Rail Yard had knowledge of the contamination of the property - a date no later than 2004, when the Plaintiffs began carrying out remedial action on the Rail Yard.  The fact that the Plaintiffs did not own the property at the time does not alter the fact that the statute of limitation has run.

This Court has explicitly rejected the continuing trespass argument raised by the Plaintiffs in the context of a section 5 claim.  In One Wheeler Road Assocs. v. Foxboro Co., 843 F. Supp. 792, 798 (D. Mass. 1994), this Court distinguished contamination of real property from a continuing trespass claim.  Since there is no continuing trespass on Lot 99, the statute of limitation is not tolled for the section 5 claim with respect to that property and has already run out.

**III. CONCLUSION**

For the foregoing reasons, this Court GRANTS IN PART AND DENIES IN PART AVX's motion to dismiss, ECF No. 6, as follows:

(1)  AVX's motion regarding the response cost claim pursuant
     to Massachusetts General Laws, chapter 21E, sections 4
     and 4A, is DENIED.

(2)  AVX's motion regarding all other claims in the complaint
     is GRANTED.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE